UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00146-GNS-HBB

STEPHEN MAYES                                                                           PLAINTIFF

v.

SIG SAUER, INC.                                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy M. Hicks (DN 70); Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani (DN 71); and Defendant's Motion for Summary Judgment (DN 72). The motions are ripe for adjudication. For the reasons outlined below, the motions are **GRANTED**.

## I.      STATEMENT OF FACTS

On October 30, 2018, Stephen Mayes ("Mayes") was shooting his new Sig Sauer P320 X Carry 9MM pistol, which was designed and manufactured by Defendant Sig Sauer, Inc. ("Sig Sauer"). (Compl. ¶¶ 7-8, 11, DN 1; Mayes Dep. 92:2-4, Mar. 31, 2021, DN 72-2). Mayes had the gun in a holster on his hip and was preparing to draw the gun when it discharged, shooting Mayes in the thigh. (Compl. ¶ 8-9; Mayes Dep. 97:8-12). Mayes alleges the pistol discharged without a

trigger pull, which Sig Sauer refutes.  (Compl. ¶ 8; Answer ¶ 9, DN 11; *see* Mayes Dep. 100:4-101:1).

Mayes initiated this action against Sig Sauer, alleging product liability claims sounding in strict liability, negligence, and breach of express and implied warranties, as well as claims under the Kentucky Consumer Protection Act.  (Compl. ¶¶ 43-48).  Sig Sauer moves to exclude two of Mayes' experts and for summary judgment, which Mayes opposes.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 70 [hereinafter Def.'s Mot. Exclude Hicks]; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 71 [hereinafter Def.'s Mot. Exclude Villani]; Def.'s Mot. Summ. J., DN 72; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts, DN 83 [hereinafter Pl.'s Mem.]).

## II.      JURISDICTION

The Court has subject-matter jurisdiction of this dispute based upon diversity of citizenship.  *See* 28. U.S.C. § 1332(a)(1).

## III.      DISCUSSION

### A.      Defendant's Motions to Exclude Evidence and Expert Opinions

Sig Sauer contends that Timothy Hicks ("Hicks") and Peter Villani ("Villani") should be precluded from testifying as expert witnesses on the grounds that they are unqualified and their testimony is unreliable.  (Def.'s Mot. Exclude Hicks; Def.'s Mot. Exclude Villani).  Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion is admissible if:

(a)      the expert's scientific, technical, or other specialized knowledge will help
        the trier of fact to understand the evidence or to determine a fact in issue;
(b)      the testimony is based on sufficient facts or data;
(c)      the testimony is the product of reliable principles and methods; and
(d)      the expert has reliably applied the principles and methods to the facts of the
        case.

The trial court must act as a gatekeeper and ensure that expert testimony is both relevant and reliable, as required by Fed. R. Evid. 104 and 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th. Cir. 2002). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof," and "[a]ny doubts regarding the admissibility . . . should be resolved in favor of admissibility." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608-GNS-RSE, 2020 U.S. Dist. LEXIS 43123, at *8 (W.D. Ky. Mar. 12, 2020) (alteration in original) (quoting *In re E.I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015)). "[R]ejection of expert testimony is the exception, rather than the rule," as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted); *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 U.S. Dist. LEXIS 130113, at *21 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004)).  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### 1.    *Qualifications*

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted).  "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are

3

not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (internal citation omitted). Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

### a.   Timothy M. Hicks

Sig Sauer argues Hicks is not qualified to offer opinions about the alleged manufacturing or design defects in the pistol because (1) his engineering experience is primarily in automobiles; (2) "he had never fired, examined, or otherwise familiarized himself with the P320 model pistol," prior to this case and; (3) his only experience with firearms aside from personal experience is his certification to test the mechanical functioning of firearms for sale in California and Massachusetts. (Def.'s Mot. Exclude Hicks 10-11).

Hicks is a Principal Engineer who has nearly forty years of experience and is licensed in multiple states. (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. G, at 1-3, DN 70-7 [hereinafter Hicks CV]). He holds a master's degree in engineering sciences and a bachelor's degree in mechanical engineering, as well as experience in mechanical design and system evaluations, having led advanced engineering teams. (Hicks CV 2; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. F, at 1, DN 70-6 [hereinafter Hicks Report]). In his current role, Hicks conducts numerous investigations and certification tests on firearms and firearm safety devices. (Hicks Report 1). In addition to his work, Hicks is a member of the National Society of Professional Engineers, the American Society of Mechanical Engineers, and the Society of Automotive Engineers, of which he currently serves as the Chair of the Chicago section. (Hicks

Report 1).  Hicks also holds two patents regarding rear suspension in automobiles and has given

two presentations about testing techniques for structural integrity and failure analysis to members

of a variety of industries. (Hicks CV 4; Hicks Dep. 225:15-226:1, Mar. 9, 2022, DN 70-8).

Sig Sauer contends that because the bulk of Hicks' mechanical engineering experience is

related to automobiles, he is not sufficiently qualified to offer opinions on the manufacturing or

design of firearms.  (Def.'s Mot. Exclude Hicks 3).  The Sixth Circuit has previously held that an

expert's "skill, education, and training in mechanical engineering render[ed] him competent to

offer opinions on a variety of mechanical topics" despite the fact that he did not have any

specialized knowledge specific to firearms.  *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 455

(6th Cir. 2013); *see Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir.

2007) (holding that although an expert's proffered experience was not specific to a particular

industry, his background and experience made him "well-positioned to 'assist the trier of fact' to

make sense of" the evidence); *cf. Guay v. Sig Sauer, Inc.*, No. 20-cv-736-LM, 2022 U.S. Dist.

LEXIS 121360, at *20 (D.N.H. July 11, 2022) ("[T]here is no indication that mechanics of guns

are so specialized that a person requires a lifetime of experience specifically with guns or a

particular gun to be able to opine about its design or manufacturing flaws.").  In his current role,

Hicks "[p]erforms engineering investigations and failure analysis from a mechanical engineering

perspective," which involves "design analysis, product liability, intellectual property,

manufacturing, accident investigation and reconstruction, fire cause and origin, and component

testing." (Hicks CV 1).  In these analyses, he has experience with vehicles, but also non-vehicles

such as "medical, athletic, and wheelchair accessibility equipment," "consumer products," and

"other mechanical systems."  (Hicks CV 1).  Hicks' wide breadth of engineering experience and

capabilities demonstrate that, like the expert in *Palatka*, he is "competent to offer opinions on a

variety of mechanical topics," including the mechanics of the pistol at issue.  *Palatka*, 535 F. App'x at 455; *see Faughn v. Upright, Inc.*, No. 5:03-CV-00237-TBR, 2007 U.S. Dist. LEXIS 19341, at *12 (W.D. Ky. Mar. 15, 2007) ("[C]ourts have held that an expert witness need not have experience working in the specific industry he testifies about."  (citing *Surles*, 474 F.3d at 294; *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991))); *Commins*, 2020 U.S. Dist. LEXIS 43123, at *12 (determining that "an engineer who intends to testify about . . . engineering aspects of a particular machine[]" was qualified (citation omitted)).  Any lack of direct firearm experience is more suitably addressed at cross-examination.  *See Daubert*, 509 U.S. at 596.

Sig Sauer also contends Hicks' lack of familiarity with firearms in a professional setting renders him unqualified to offer opinions regarding any design or manufacturing defects of Mayes' pistol.  Sig Sauer asserts Hicks has never been involved with or witnessed the design and manufacture of a firearm, never published articles related to such topics, and never inspected or tested a P320 or a comparable firearm before this case.  (Def.'s Mot. Exclude Hicks 3).  Hicks' lack of involvement in the manufacture and design of a firearm is immaterial to his ability to assess Mayes' firearm for defects, considering his general design and manufacturing experience.  *See Palatka*, 535 F. App'x at 454-55 (determining an expert was qualified even though "he [was] not a firearms expert and ha[d] not consulted in the design or manufacture of a firearm."); (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).  It is also immaterial that Hicks has not published articles about the design and manufacture of firearms.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at *9-10 (determining that an expert was qualified to testify despite the fact that he had not "authored reports, texts, or articles" about the subject matter to which he was meant to testify).  Furthermore, the fact that Hicks has not inspected a P320 or a comparable firearm before this case does not

render him unqualified to testify as an expert.  Hicks has significant mechanical engineering experience as well as familiarity with the component parts of firearms and is certified to identify malfunctions.  (Hicks CV 1-4; Hicks Report 1; Hicks Dep. 57:18-58:14, DN 70-8).  These qualifications are sufficient to overcome the purported shortcomings, as "[t]he law does not require that [an expert] be the most qualified expert conceivable, only that he will 'assist the trier of fact in understanding and disposing of issues relevant to the case.'"  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at *10 (quoting *Pride*, 218 F.3d at 578).

Finally, Sig Sauer argues that Hicks' certifications to test firearms in California and Massachusetts are insufficient to demonstrate that he is qualified to testify as an expert.  (Def.'s Mot. Exclude Hicks 11).  California's certification process required Hicks to apply, subject his facilities to an inspection, demonstrate for the certifying body that he could conduct firearm tests, and then produce a report compliant with its procedures.  (Hicks Dep. 56:23-57:2, DN 70-8).  With this certification, Hicks evaluates firearms and determines whether a specific model can be certified for sale in California, which he accomplishes by identifying that a firearm model meets certain loaded-round indicator requirements, firing six hundred rounds through each sample with incremental inspections, recording evident malfunctions, "field stripping" the model to look at the component parts, checking if all fasteners are tight, and conducting a drop test.  (Hicks Dep. 57:20-58:12, DN 70-8).  This experience alongside Hicks' engineering career and education is sufficient to render him qualified in identifying any alleged defects in Mayes' pistol.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at *10.

Sig Sauer cites to *Whybark v. Synthes, Inc.*, No. 5:15-CV-00084-GNS-LLK, 2017 U.S. Dist. LEXIS 67988 (W.D. Ky. May 4, 2017), to support its contention that Hicks is not qualified.  (Def.'s Mot. Exclude Hicks 11-12).  The facts in *Whybark*, however, are distinguishable from the

present action.  In *Whybark*, the plaintiff sought to present a physician who would testify that a broken bone screw potentially had a defect, but the physician had no manufacturing or engineering experience.  *Whybark*, 2017 U.S. Dist. LEXIS 67988, at *9, *12.  Ultimately, the physician was excluded because his "opinion as to a defect in manufacture of the bone screw relate[d] to a field entirely different from his medical background."  *Id.* at *12.  Hicks is not being proffered to offer his opinion regarding a field outside of his own; he is an engineer seeking to testify about engineering defects.  Additionally, he has general design and manufacturing experience, unlike the doctor in *Whybark*.  (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).

Therefore, Sig Sauer's arguments regarding Hicks' qualifications are unavailing at this stage, as "[g]aps in [his] qualification or knowledge generally go to the weight of the . . . testimony, not its admissibility."  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at *12 (first alteration in original) (citation omitted); *see Daubert*, 509 U.S. at 596 (citation omitted).[1]

### b.   Peter Villani

Sig Sauer similarly maintains that Villani is not qualified to opine about alleged manufacturing or design defects in the pistol because he is not an engineer, has never taken any engineering coursework, and does not have any experience in firearm design and manufacturing. (Def.'s Mot. Exclude Villani 2).

Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert

---

[1] Sig Sauer alleges that Mayes conceded Hicks is not qualified to offer opinions regarding design defects, as Mayes stated that Hicks "limits his report to how this specific product, the Sig P320, has failed due to manufacturing defects."  (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 3, DN 86 (quoting Pl.'s Mem. 23)).  Interpreting this statement as a concession of Hicks' qualifications is attenuated at best, as it is merely an effort to explain the scope of Hicks' report. (*Cf.* Hicks Report 3, 5-7 (noting both design and manufacturing defects); Hicks Dep. 226:6-15, DN 70-8 (discussing Hicks' general design experience)).

Ex. I, DN 71-9 [hereinafter Villani CV]).  He has worked as a manager at a gun range where he taught gun safety courses and performed cleaning and maintenance on customers' firearms, including replacement of broken components.  (Villani CV; Villani *Guay*[2] Dep. 46:18-23, 47:17-20, Mar. 1, 2022, DN 71-10).   These responsibilities required him to fully disassemble the pistols and remove the components.  (Villani *Guay* Dep. 50:17-25).  Villani performs similar tasks in his current role with the Veteran Affairs Police.  (*See* Villani *Guay* Dep. 54:24-55:7).  He is also a certified armorer and has obtained a certification from Sig Sauer for the P320.  (Villani *Guay* Dep. 55:17-23; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 9, DN 83-9).

Villani's lack of design and manufacturing experience renders him unqualified to offer opinions regarding alleged design and manufacturing defects.  Villani's qualifications amount to experience in handling, assembling, and disassembling firearms, which are insufficient qualifications for him to testify about the alleged defects.  In fulfilling his responsibilities as an armorer, customers would bring Villani guns with "[b]roken firing pins, broken extractors, failures to feed, damaged magazines . . . [and] really filthy guns that wouldn't operate because they were so filthy the gun wouldn't even cycle properly," so his responsibilities were largely replacing broken parts and performing routine cleaning and maintenance.  (Villani *Guay* Dep. 47:9-16; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. F, DN 87-6).  Although this role provided Villani with the ability to identify broken parts, damage to a gun, or some other abnormality, his experience does not go so far as to qualify him to testify about the cause of such damage or abnormality.  Although he can adequately identify a problem, there is nothing in Villani's

---

[2] Plaintiff's experts were hired to offer opinions in cases in addition to the current action.  To avoid duplicative deposition questions, some generally applicable information was collected in depositions for the other cases and submitted to the record in this case.

experience that enables him to identify whether the cause of a problem is in fact a design or manufacturing defect versus damage from ordinary use or misuse by the owner of the gun.

Moreover, Villani has no relevant experience with manufacturing or designing commercial products. (Villani *Frankenberry* Dep. 120:1-7, 120:22-24, June 18, 2021, DN 87-5. *But see* Villani *Guay* Dep. 57:19-58:2 (noting that Villani has designed and manufactured a holster made out of two pieces of leather for his personal use)). This is a significant distinction because he lacks the "scientific, technical, or other specialized knowledge" to be able to opine about manufacturing and design defects given that he has no familiarity or experience to support those opinions. *See* Fed. R. Evid. 702. This is in contrast to Hicks, who has design and manufacturing experience as an engineer. Villani is more akin to the expert in *Whybark* than he is to Hicks, because if permitted to testify, he would be providing expert opinions in a field entirely different than his own. *See Whybark*, 2017 U.S. Dist. LEXIS 67988, at *12.

Mayes' contends that "Villani need not possess a degree in mechanical engineering . . . to have extensive 'specialized knowledge' in firearms . . . ." (Pl.'s Mem. 4). Indeed, he does not need to have a degree; however, he must have experience with designing and manufacturing processes to be able to opine about defects resulting from those processes. The issue with Villani's qualifications is that he possesses no experience whatsoever with designing or manufacturing products. For that reason, he is unqualified to offer expert testimony as to the existence of alleged design or manufacturing defects in Mayes' pistol.

Given that both experts opinions rely on substantially similar theories and methods, the reliability of their testimony will be jointly considered, notwithstanding Villani's lack of qualifications.

### 2.     *Reliability*

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. Thus, there is no definitive checklist for determining whether an expert's testimony is reliable, but *Daubert* outlines a non-exhaustive list of factors for courts to consider: (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ." *Id.* at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co.*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is

why the district court enjoys broad discretion over where to draw the line."   (internal citation omitted) (citation omitted)).

"The subject of an expert's testimony must be 'scientific . . . knowledge.'"   *Daubert*, 509 U.S. at 589-90.  The gatekeeping obligations in *Daubert* only applied to "scientific knowledge," but were later extended to include "testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 592; *Kumho Tire Co.*, 526 U.S. at 141, 152.  "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably there are no certainties in science."  *Id.*  As the Supreme Court has noted:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and opinion offered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert," such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *cf. Clark v. Takata Corp.*, 192, F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method." (citation omitted)); *Scientific Method, Black's Law Dictionary* (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication."). Ultimately, it is Mayes' burden to establish that his proffered experts' "theories are reliable and adequately supported by sound technical data, methodology and testing."  *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

12

Mayes submits Hicks' and Villani's opinions to support his claims that there are multiple defects in Mayes' pistol. Hicks and Villani were present for the inspection of Mayes' P320 and several other firearms on March 18, 2021. (Hicks Report 1; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 8, at 5, DN 83-8 [hereinafter Villani Suppl. Report]). Hicks' report describes the process used to inspect and examine the guns and notes tests performed by a Sig Sauer expert under laboratory conditions. (Hicks Report 2). Hicks and Villani based their opinions on their review of CT scan images of the gun, close up images of the surfaces of the striker foot and sear face inside the gun's fire control unit, a simulation of the gun's mechanics developed by an independent third party, viewing the function test performed by Sig Sauer's expert and the single cycle that Hicks performed, several other P320s allegedly containing the same defects, and the facts of the incident provided by Mayes' counsel in the form of the Complaint filed in this action. (Hicks Dep. 27:7-8, DN 70-8; Hicks Dep. 14:12-17, Mar. 9, 2022, DN 88-2; Hicks *Guay* Dep. 32:10-15, DN 70-10, Villani Suppl. Report 5-6).

According to Hicks' theory, two internal safeties within the pistol have to be overcome for the P320 to discharge without a trigger pull: (1) the striker foot-to-sear interface and (2) the safety lock. (Hicks Dep. 129:2-9, DN 70-8). Hicks opines that low friction between the striker foot and the sear can result in the disengagement of the two parts. (Hicks Dep. 117:2-8, DN 70-8). If those two parts lose connection due to the striker foot rotating enough either to the left or right to cause the striker foot to disconnect from the sear, the firearm could discharge. (Hicks Dep. 192:9-13). Hicks also claims that disengagement can occur where the striker foot moves up and the sear moves down due to the inertia from the weapon being carried. (Hicks *Jinn* Dep. 117:1-5, Mar. 10, 2022, DN 70-9). Hicks also theorizes that a defect in the safety lock, coupled with a defect in the striker foot, can lead to an uncommanded discharge if the safety lock fails to restrain the striker foot from

propelling forward to strike the loaded cartridge.  (Hicks Dep. 175:16-18, 176:5-9, DN 70-8).

Villani utilizes a similar theory, based primarily on the existence of "rollover," which is "excess

molding material left over from the manufacturing process that hasn't been removed before

installation of that part into the product."  (Villani *Guay* Dep. 90:8-11).  He contends that

"rollover" can reduce the contact area between components and thus cause them to disengage,

resulting in an uncommanded discharge.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex.

H, at 12, DN 71-8 [hereinafter Villani Report]; *see* Villani Dep. 12:21-25, DN 71-11).

   Based on his review, Hicks identified five allegedly defective conditions in Mayes' P320.

First, there was no secondary processing of the surface of the interface between the sear and striker

foot, resulting in diminished quality of the interface.  (Hicks Report 10).  He alleges that these

components, which are produced using a Metal Injection Molding ("MIM") process, are usually

secondarily processed to eliminate any variation on critical surfaces, such as the interface here.

(Hicks Report 3; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert, Ex. C, at 38, DN 87-3

[hereinafter Watkins Report]).  Mayes' firearm allegedly had inconsistencies on the surface area

of the interface and a raised area around the periphery of the interface surface ("rollover")  which

minimized the contact area and increased the likelihood that the components would disengage,

leading to a discharge.  (Hicks Report 4).  Second, Hicks identified an "[a]xial variation of the

striker pin after each slide movement causing misalignment of [the] safety lock tab to striker pin,

and the striker foot lateral position to the sear step face."  (Hicks Report 10).  These misalignments

similarly resulted in a less secure interface between the components, making an uncommanded

discharge more likely.  (Hicks Report 7).  Hicks also discussed a third defective condition,

specifically the "[a]bility of the slide (and therefore the strike assembly) to move vertically relative

to the sear reducing the interfacing surface contact area even further."  (Hicks Report 10).  He

opined that a minimal amount of overlap between the components means that the striker could move forward and discharge a round with only minor trigger movement.  (Hicks Report 5).  The fourth defect Hicks identified was that "[t]he sear is unable to fully rotate forward to allow flat engagement of the striker foot."  (Hicks Report 10).  The final defect discussed is that the pistol does not have a safety lever return spring, which "allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation."  (Hicks Report 10).  Villani identified similar defects, as well as others, all contributing to contact surface area deficiency that resulted in an uncommanded discharge.  (Villani Report 10, 12-13; Villani Suppl. Report 1-3).

Sig Sauer's main contention is that Hicks' and Villani's opinions should be excluded as unreliable because they have done no testing to support their theories.  (Def.'s Mot. Exclude Hicks 2, 6-8, 14).  Sig Sauer notes that Hicks' determinations are based on only visual inspections of the subject pistol and exemplar pistols.  (Def.'s Mot. Exclude Hicks 4).  Thus, Sig Sauer maintains these experts cannot prove the defects identified can cause a discharge without a trigger pull because they conducted no physical testing to replicate a P320 discharge.  (Def.'s Mot. Exclude Hicks 8; *see* Hicks Dep. 117:2-13, 234:5-10, DN 70-8).

Indeed, Hicks admitted that no testing has been conducted to confirm that the sear and striker can lose connection due to the striker foot rotation; he has no calculations regarding the extent to which contact surface area is needed to prevent a loss of engagement or how much inertia would be required to move the sear down.  (Hicks Dep. 117:14-17, 192:14-19, DN 70-8; Hicks *Jinn* Dep. 117:18-21, DN 70-9).  Villani similarly conceded that he had conducted no testing to support his theories.  (Villani *Guay* Dep. 83:24-25, Mar. 1, 2022, DN 87-1; *see* Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; Villani Dep. 14:16-19).  In response, Hicks contends that the striker foot had to have "walked off" the sear, as there is no other means besides pulling the trigger for

15

the firearm to discharge.  (Hicks Dep. 129:19-22, DN 70-8).  Further, he supports his theories by citing his review of videos of other P320 discharges, although he was not aware of any such discharge occurring without trigger movement.  (Hicks Dep. 169:4-9, DN 70-8; *see* Hicks *Jinn* Dep. 103:7-20, Mar. 10, 2022, DN 86-4 (noting that Hicks conducted no independent analysis regarding the cause of the recorded discharges); *see also* Knox Decl. ¶¶ 6, 8, DN 86-6; Burmester Decl. ¶ 2, DN 86-7).

"[H]ands-on testing is not an absolute prerequisite to the admission of expert testimony, but the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice."  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (citation omitted); *accord Johnson ex rel. Gilfeather v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007) (quoting *Dhillon*, 269 F.3d at 870).  Furthermore, opinions amounting to no more than a hypothesis are not reliable, despite how convincing they may appear.  *Ada-Es, Inc. v. Big Rivers Elec. Corp.*, No. 4:18-CV-00016-JHM, 2020 U.S. Dist. LEXIS 219073, at *9 (W.D. Ky. Nov. 23, 2020).  Opinions that are based solely on the occurrence of an accident or on "conjecture and speculation" are unreliable and should be excluded.  *Berry*, 108 F. Supp. 2d at 755 (citation omitted).

Both Hicks' and Villani's opinions are insufficiently reliable to warrant admission in this case, as they are not based on tested or otherwise corroborated theories.  Neither of the experts have conducted physical testing on Mayes' pistol specifically, nor any other pistol to support their theory regarding the amount of rollover needed to cause an uncommanded discharge.  (Hicks Dep. 117:2-13, 192:14-19, DN 70-8; Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; *see* Villani *Frankenberry* Dep. 127:18-21 (admitting that he did not adhere to a specific methodology)).  They also do not offer any calculations to support their theories.  (Hicks Dep. 117:14-17, DN 70-8;

Hicks *Jinn* Dep. 117:18-21, DN 70-9).  Plainly, both experts opine that a raised surface on the interface between components of the gun *could* result in an uncommanded discharge in theory. But neither Hicks nor Villani offers any evidence suggesting that such an uncommanded discharge occurs generally or that it did in this case.  Mayes has offered the bare hypotheses of both Hicks and Villani, which fall short of admissibility.

To be sure, it is not required that the experts conduct a litany of tests on Mayes' specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges. *See Reynolds v. Freightliner LLC*, No. 05-70-GFVT, 2006 U.S. Dist. LEXIS 97244, at *28 (E.D. Ky. June 21, 2006) ("Absent some formulaic process involving engineering or other mathematical principles, the [c]ourt is unable to determine how [an expert] could have surmised or even began to calculate the forces involved [and] reach his conclusions.").  Hicks' and Villani's theories have no such support; they have identified no publications recognizing their theory, they have not subjected their opinions to peer review, and they have not demonstrated that their theories are generally accepted in the relevant communities. *See Daubert*, 509 U.S. at 593-94.  As presented, Hicks and Villani offer no more than "conjecture and speculation."  *See Berry*, 108 F. Supp. 2d at 755.  Ultimately, there is an "analytical gap" between the theories proffered and the assertion that the alleged defects cause uncommanded discharges.  *Gen. Elec. Co.*, 522 U.S. at 146 (citation omitted).  Therefore, both experts must be excluded as their opinions are unreliable.

Mayes does not dispute that neither Hicks nor Villani have tested their theories.  Instead, he argues that the *Daubert* factors are not stringent, and any testing would be too dangerous for the experts to conduct.  (Pl.'s Mem. 13, 23).  Indeed, *Daubert* is a flexible test, but that contention cannot overcome the necessity that expert opinions be more than a "subjective belief or

unsupported speculation," which is all that these opinions amount to. *Daubert*, 509 U.S. at 590; *see id.* at 594-95. Furthermore, Mayes has not met his burden to demonstrate that possible testing is so dangerous that his experts could not have attempted to undertake any empirical assessment of their theories. *See generally Berry*, 108 F. Supp. 2d at 754 (stating that it is the Plaintiff's burden to demonstrate that an expert's opinion is reliable). Indeed, Hicks stated that drop testing[3] could create inertial forces causing "the sear to lose its grip on the striker foot[,]" although not a direct comparison. (Hicks *Guay* Dep. 37:4-18; *see* Hicks *Jinn* Dep. 106:15-18, DN 83-6). Additionally, vibration testing can be utilized to test these theories, considering Sig Sauer has conducted such tests. (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 10, DN 87 ("Sig has produced testing conducted by Dayton T. Brown, Inc. . . . demonstrating that the P320 will not fire due to vibration or jostling without trigger actuation." (emphasis omitted) (footnote omitted))); *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. H, DN 87-8).

Based upon the foregoing, Hicks and Villani cannot testify as expert witnesses in this matter. As such, Sig Sauer's motions to exclude are granted.

### B.     Defendant's Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the

---

[3] Drop testing is a testing method Hicks uses when certifying firearms, which consists of a "pneumatic clamp-grip system set up where the firearm is inserted . . . and once it's ready, [he] activate[s] the switch to drop the weapon into a . . . 6-by-6 piece of concrete that is at least three inches or three and a half inches thick." (Hicks Dep. 58:19-23, DN 70-8).

case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must present facts demonstrating a material factual dispute that must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). When considering the evidence, the Court must view it in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). If the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"The [Kentucky Product Liability Act] applies to all damage claims arising from the use of products, regardless of the legal theory advanced." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997); *see* KRS 411.300(1); *see also Thacker v. Ethicon, Inc.*, 47 F.4th 451, 459 (6th Cir. 2022). A plaintiff may advance a product liability action under theories of strict liability, negligence, and breach of warranty. *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)). The Kentucky Product Liability Act recognizes claims based on defective design and manufacture and failure to warn. *Id.* (citing *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995)); *cf. Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (noting that each theory constitutes separate and distinct claims (citing *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010))). In such actions, the plaintiff must show that the product had a defect and that the defect caused the alleged damages. *Prather*, 960 F. Supp. 2d at 706 (citing *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998); *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995)).

1.     *Existence of Defects*

Sig Sauer's motion for summary judgment must be granted because there is no genuine issue of material fact regarding the existence of a design or manufacturing defect in the P320. Under Kentucky law, expert witnesses are "generally necessary" to prove the presence of a defect in a products liability action.  *Honaker v. Innova, Inc.*, No. 1:04-CV-132(M), 2007 U.S. Dist. LEXIS 30225, at *4 (W.D. Ky. Apr. 23, 2007) (quoting William S. Haynes, *Kentucky Jurisprudence: Torts* §§ 21-28 (1987)).  As the Sixth Circuit has explained,

> Expert testimony may be required in cases in which the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition of the product caused the product's failure and caused the injury to the plaintiff.

*Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (citation omitted).  By contrast, "matters of general knowledge" do not require expert testimony.  *Honaker*, 2007 U.S. Dist. LEXIS 30225, at *5; *accord Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967) ("[A] proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from testimony on the basis of ordinary knowledge gained in the ordinary affairs of life, expert testimony is needed." (citation omitted)).  Accordingly, expert testimony is necessary unless a defect is of the type that the jury can comprehend "as well as a specially trained expert could . . . ."  *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 681 (E.D. Ky. 2013) (citation omitted), *aff'd*, 579 F. App'x 372 (6th Cir. 2014).  "[C]ourts permit[] inferences of defects premised on . . . circumstantial evidence *only* when the plaintiffs [are] able to eliminate all other reasonable explanations for the accident, thereby leaving manufacturing defect as the only reasonabl[e] possibil[ity] . . . ."  *Siegel v. Ky. Farm Bureau Mut. Ins. Co.*, No. 3:08CV-00429-S,

2010 U.S. Dist. LEXIS 74876, at *11-12 (W.D. Ky. July 26, 2010) (citations omitted), *aff'd sub nom. Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397 (6th Cir. 2012) (emphasis added).

The inner workings and mechanics of the P320 are not "matters of general knowledge," but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists. *See Honaker*, 2007 U.S. Dist. LEXIS 30225, at *5; *Stevens*, 1 F. App'x at 458. Furthermore, any circumstantial evidence offered by Mayes cannot eliminate all other reasonable explanations for the accident because there remains a dispute as to whether Mayes pulled the trigger, given there were no witnesses to the accident. (Mayes Dep. 92:2-5. *Compare* Mayes Dep. 100:21-101:4 (stating that Mayes did not pull the trigger), *with* Watkins Report 3 (asserting that "[n]o physical or empirical evidence . . . suggests the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Mayes' testimony.")).

Fed. R. Civ. P. 56 requires entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element for which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. Given that Hicks and Villani are Mayes' only witnesses to testify about the P320's alleged defects and they have been excluded as experts, Mayes is left with no expert witnesses to testify regarding the alleged defect with Mayes' P320. Sig Sauer correctly asserts that Mayes did not meet his burden of demonstrating causation between the alleged defect and Mayes' injury. (Def.'s Mot. Summ. J. 6-8). As "expert witnesses are generally necessary, indeed essential, in products liability cases . . . to prove such matters as a product defect *and* proximate causation[.]" *Fimbres v. Garlock Equip. Co.*, No. 3:11-CV-226-

CRS-JDM, 2014 U.S. Dist. LEXIS 79384, at *10-11 (W.D. Ky. June 11, 2014) (alteration in original) (emphasis added) (citation omitted).

Thus, with no evidence to establish a defect or causation with respect to the P320, Mayes cannot establish an essential element of his product liability claims for negligence or defective design and manufacture.  Accordingly, Sig Sauer's motion must be granted.

### 2.    *Breach of Express and Implied Warranties*

Sig Sauer also moves for summary judgment on Mayes' product liability claims based on breach of express and implied warranties.  (Def.'s Mot. Summ. J. 9-10).  Mayes has not attempted to argue a breach of express or implied warranty in his response to Sig Sauer's motion for summary judgment, nor has Mayes otherwise furthered these claims, which are therefore dismissed. *Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived.  Where claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." (alteration in original) (internal citation omitted)).[4]

### IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows: Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy M. Hicks (DN 70) is **GRANTED**; Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani (DN 71) is **GRANTED**; and Defendant's Motion for Summary Judgment (DN 72) is

---

[4] In addition to the claims addressed, two causes of action asserted in the Complaint were not argued in Sig Sauer's motion for summary judgment.  Mayes has also asserted claims based on a failure to warn as well as violation of the Kentucky Consumer Protection Act.  (Compl. ¶¶ 47-48). As neither of these causes of actions were substantively addressed in the motions considered here, those claims remain.

**GRANTED**.  Plaintiff's failure to warn and Kentucky Consumer Protection Act claims are still pending.

Greg N. Stivers, Chief Judge

United States District Court

March 29, 2023

cc:      counsel of record